STATE ex rel. CORDRAY, Atty. Gen., Appellee,

v.

HELMS, d.b.a. Countryview South Apartments, et al., Appellants.

[Cite as State ex rel. Cordray v. Helms, 192 Ohio App.3d 426, 2011-Ohio-569.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 24754.

Feb. 9, 2011.

428

Michael Dewine, Attorney General, and L. Scott Helkowski and Jessica Atleson, Assistant Attorneys General, for appellee.

William T. Whitaker and Andrea Whitaker, for appellants.

DICKINSON, Presiding Judge.

## INTRODUCTION

{¶ 1} James and Joel Helms operate Countryview South Apartments, a 34–unit building in Green, Ohio. For many years, the building received its water from two wells on the property and sent its sewage to an on-site wastewater-treatment plant. In 2000, the Ohio Attorney General filed a complaint against the Helmses, alleging that they had failed to properly operate the wastewater-treatment plant. The action resulted in a written consent decree that required the Helmses to make changes to the treatment plant, including applying for necessary permits. In 2004, the attorney general moved for an order to show cause, arguing that the Helmses were in contempt for violating the consent decree. In 2007, the attorney general filed another complaint against the Helmses for failing to properly monitor the quality of Countryview's drinking water and for illegally discharging sewage into a wetland. The two cases were tried together to the bench. The trial court found that the Helmses had violated the consent decree and Ohio's safe-drinking-water and wastewater-treatment laws. It ordered them to stop operating its wells and wastewater-treatment plant and connect to public systems. It also fined them for the violations. The Helmses have appealed, arguing that the trial court did not have jurisdiction over the 2007 case, that the court incorrectly determined that the wetlands on their property are waters of the state, that it incorrectly denied their motion for new trial, that it incorrectly

found that they could not use the wetlands for wastewater treatment, that it incorrectly relied on testing data provided by the Ohio Environmental Protection Agency, that it incorrectly ordered them to connect to the public sewer system, that it incorrectly determined that the building's water system was a public water system, that it incorrectly determined that they stipulated to the drinking-water violations, and that it imposed excessive penalties for the drinking-water violations. We affirm because the trial court had jurisdiction over the 2007 case, the wetlands are waters of the state, the court correctly denied the Helmses' motion for new trial, the court properly determined that the existing wetlands could not be used for treatment purposes, the court properly relied on the state's testing data, Countryview's water system was a public water system, the Helmses violated Ohio's safe-drinking-water laws, and the trial court exercised proper discretion when it imposed a penalty for the drinking-water violations.

## BACKGROUND

{¶ 2} The Helms family has owned the property where Countryview is located on and off over the last few decades. According to Joel Helms, in 1973, the family sold some of its land to a developer, who constructed the apartment building. At the time, the developer obtained a permit to install a three-stage wastewater-treatment plant on the property, with an optional disinfection step at the end. The developer, however, built only the first two stages of the plant, believing they were sufficient to treat the sewage from the building. After being treated by the plant, the wastewater traveled through an underground pipe that discharged into a tributary of a creek.

{¶ 3} According to Joel Helms, around 1985, a farmer cut the pipe to the tributary while operating a plow on the ground covering it. Instead of repairing the pipe, the owners let the sewage saturate the field, which developed into a wetland. Joel Helms testified that when his family reacquired Countryview in the late 1980s, he left the pipe alone because he had learned that wetlands could be useful in treating wastewater.

{¶ 4} Throughout the 1990s, the Ohio Environmental Protection Agency attempted to get the Helmses to comply with the original permit to install. It eventually filed a complaint against them, which resulted in a consent decree. Under the consent decree, the Helmses agreed to comply with all of Ohio's water-pollution-control laws. They agreed to hire a wastewater-treatment-plant operator, who would conduct daily inspections and keep a log of inspections and corrective actions. They also agreed to submit a "complete and approvable" permit-to-install application for a wastewater-treatment plant that would correct the alleged problems with the plant. They further agreed to submit a complete and approvable application for a National Pollutant Discharge Elimination Sys-

tem ("NPDES") permit for the treatment plant. The consent decree contained stipulated penalties if the Helmses did not meet the prescribed deadlines.

{¶ 5} The Helmses hired a professional engineer to help them develop their permit-to-install application. The application they submitted to the Ohio Environmental Protection Agency incorporated the first two treatment stages already in place. For the third stage, the Helmses proposed using the existing wetlands on their property and constructing additional wetland cells to filter pollutants from the sewage. Although a final disinfection stage was no longer optional, the Helmses' application did not include a disinfection stage because Joel Helms believed the wetlands themselves would disinfect the sewage.

{¶ 6} The Ohio Environmental Protection Agency reviewed the permit-to-install application and informed the Helmses that it was inadequate. When the Helmses failed to revise their plans, the agency denied their application. Meanwhile, it inspected the wastewater-treatment plant and discovered that it was not being properly maintained. The attorney general, therefore, filed a contempt action, requesting that the court fine the Helmses and seeking injunctive relief. In 2005, the trial court began a hearing on the contempt motion. Because the Helmses were contesting the denial of their permit-to-install application in an administrative proceeding, however, the court continued the hearing.

{¶ 7} While the parties were awaiting the result of the administrative proceeding, the Helmses continued to discharge sewage into the wetland and made changes to the wetland, which included the construction of several berms. Over the same period, the building's drinking-water system had a number of violations. At the request of the Ohio Environmental Protection Agency, therefore, the attorney general filed a complaint seeking fines for the drinking-water and water-pollution violations. Because public-water and sewer lines had been added to an adjacent road, the attorney general also requested that the court order the Helmses to connect Countryview to the public systems.

{¶ 8} In August 2008, the trial court held a hearing on the violations alleged in the 2007 complaint. It determined that the Helmses were liable for all of the drinking-water and water-pollution violations and ordered them to connect to the public-water and sewer lines. It penalized the Helmses $500,000 for the water-pollution violations, which was subject to abatement if they complied with the injunctive relief ordered.

{¶ 9} In April 2009, the trial court finished the hearing on the contempt motion and took evidence regarding the appropriate penalty for the drinking-water violations. It issued a judgment, finding that the Helmses had violated the consent order. It assessed a penalty of $3,146,000 for the consent-decree violations, which could be abated to $31,460 if the apartment building tied into the public sewer system within 30 days. It assessed a penalty of $825,000 for the

drinking-water violations, but told the Helmses that because they had connected the apartment building to the public-water system, the penalty would be abated to $82,500 if the building remained connected to that system. The Helmses have appealed the trial court's judgment, assigning nine errors.

## JURISDICTION

{¶ 10} The Helmses' first assignment of error is that the attorney general did not have authority to file the 2007 complaint because the Ohio Environmental Protection Agency did not properly authorize the lawsuit. They have argued that because the attorney general did not have authority to file a complaint, the trial court lacked jurisdiction over the action.

{¶ 11} The 2007 complaint alleged both safe-drinking-water and water-pollution violations. Chapter 6109 of the Ohio Revised Code addresses safe drinking water. Under Section 6109.32, "[t]he attorney general, upon written request by the director [of environmental protection], shall bring an action for injunction or other appropriate action against any person violating or threatening to violate [this chapter]." Chapter 6111 addresses water pollution. Under Section 6111.07(B), "[t]he attorney general, upon the written request of the director [of environmental protection], shall prosecute any person who violates, or who fails to perform any duty imposed by, sections 6111.01 to 6111.08 of the Revised Code or who violates any order, rule, or condition of a permit issued or adopted by the director pursuant to those sections." It further provides that "[t]he attorney general, upon written request of the director, shall bring an action for an injunction against any person violating or threatening to violate this chapter or violating or threatening to violate any order, rule, or condition of a permit issued or adopted by the director pursuant to this chapter."

{¶ 12} The Helmses first contested the attorney general's authority to prose-cute the 2007 case at a December 2008 hearing. At that hearing, Nancy Rice, environmental manager of the drinking-water program for one of the Ohio Environmental Protection Agency's district offices, testified that the director of her agency had submitted a letter to the attorney general, referring the Helmses' case to him. After Rice testified, the prosecutor told the court that although he did not have a copy of the authorization letter with him, he could provide it after the hearing. The court told the parties that he was willing to accept the letter as a post-hearing exhibit and asked the Helmses if they had any objections. Joel Helms replied, "If the letter exists, yes, I have no objection to it."

{¶ 13} The binder of exhibits admitted at the December 2008 hearing contains a letter from the director of the Ohio Environmental Protection Agency to the attorney general requesting that he initiate civil proceedings against the Helmses under Section 6109.32. The letter refers to a previous referral regarding the

Helmses for alleged violations under Chapter 6111. We therefore conclude that the trial court correctly determined that the attorney general had authorization to file the 2007 action against the Helmses for their alleged drinking-water and water-pollution violations. The Helmses' first assignment of error is overruled.

## WATERS OF THE STATE

{¶ 14} The Helmses' second assignment of error is that the trial court incorrectly determined that because all wetlands are waters of the state, the wetlands on their property could not be used for sewage-treatment purposes. The attorney general alleged in the 2007 complaint that the Helmses illegally discharged sewage into the waters of the state without an appropriate permit.

{¶ 15} Under R.C. 6111.04(A)(1), "[n]o person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state." "'Waters of the state' means all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and other bodies or accumulations of water, surface and underground, natural or artificial, regardless of the depth of the strata in which underground water is located, that are situated wholly or partly within, or border upon, this state, or are within its jurisdiction, except those private waters that do not combine or effect a junction with natural surface or underground waters." R.C. 6111.01(H).

{¶ 16} The Helmses have argued that the trial court incorrectly looked at the age of the wetlands to determine whether they were waters of the state. They have also argued that the trial court incorrectly disregarded their evidence that the wetlands are "private waters that do not combine or effect a junction with natural surface or underground waters." They have further argued that the wetlands on their property are not "wetlands" under the Ohio Administrative Code because they are not "inundated or saturated by surface or ground water at a frequency and duration that are sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." Ohio Adm.Code 3745–1–02(B)(90).

{¶ 17} Initially, we note that the trial court did not write that all wetlands are waters of the state. In addition, the court did not decide whether the wetlands on the Helmses' land were waters of the state based on how long they had existed. What the court wrote was that "the State provided convincing evidence that the wetlands at issue are 'waters of the state' that have existed continually from at least as early as 1938 * * *." The court relied on the testimony of Mick Micacchion, a wetland ecologist, who testified that the wetlands are waters of the state because there is a connection between them and the ground-water aquifer.

{¶ 18} Whether wetlands combine or affect a junction with natural surface or underground waters is a question of fact. Accordingly, the Helmses' argument is, essentially, that the trial court's finding that there is a connection between the wetlands and the aquifer was against the manifest weight of the evidence. In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 26, the Ohio Supreme Court held that the test for whether a judgment is against the weight of the evidence in civil cases is different from the test applicable in criminal cases. According to the Supreme Court in *Wilson*, the standard applicable in civil cases "was explained in *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus." Id. at ¶ 24. The "explanation" in *C.E. Morris* was that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." Id., quoting *C.E. Morris Co.*, 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus (1978); but see *Huntington Natl. Bank v. Chappell*, 183 Ohio App.3d 1, 2007-Ohio-4344, 915 N.E.2d 665, at ¶ 17–75 (Dickinson, J., concurring in judgment only).

{¶ 19} Micacchion testified that some wetlands are connected to ground water. He testified that not only can ground water feed wetlands, but wetlands can recharge ground-water supplies. He explained, therefore, that if a wetland is contaminated, it can cause problems with the local ground water. He further testified that based on the coring samples he took, he concluded that the wetlands on the Helmses' property were fed from ground water.

{¶ 20} The Helmses called a geological consultant, who testified that there is no vertical connection between the wetlands and ground water. The court discounted his testimony, however, because his analysis was "too derivative" from data taken by others. For example, he testified that his only reason for thinking that the ground samples he analyzed came from the wetlands was because that was what Joel Helms had told him. The trial court found that Micacchion was more credible than the Helmses' expert about whether there was a connection between the wetlands and ground water. We, therefore, conclude that there is some competent, credible evidence to support the trial court's finding that the wetlands on the Helmses' property combine with the ground-water aquifer and therefore do not fall within the exception to the statutory definition of "waters of the state." R.C. 6111.01(H).

{¶ 21} Regarding the Helmses' argument that the wetlands are not "wetlands" under the Ohio Administrative Code because they are not fed from natural water channels, we note that the definition does not require that wetlands be fed by "natural" channels. It requires only that the land be "inundated or saturated by surface or ground water at a frequency and duration that are

sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." Ohio Adm.Code 3745–1–02(B)(90). Even if the Helmses were correct in their interpretation of the definition, there is competent, credible evidence in the record to support the trial court's finding that the wetlands are fed by ground water. The Helmses' second assignment of error is overruled.

## NEW TRIAL

{¶ 22} The Helmses' third assignment of error is that the trial court incorrectly denied their motion for new trial. They have argued that Section 19b, Article I of the Ohio Constitution, an amendment that passed after the trial court entered its judgment, gives them "the inviolate right to the reasonable use of the existing wetlands wholly located on the private property of [Countryview]." Subsection C of the amendment provides that "[a] property owner has a property interest in the reasonable use of the ground water underlying the property owner's land." Subsection D provides that "[a]n owner of riparian land has a property interest in the reasonable use of the water in a lake or watercourse located on or flowing through the owner's riparian land."

{¶ 23} It is doubtful that the amendment touches the Helmses' wetlands. Although the wetlands may be fed by ground water, they are not ground water themselves. They also are not a lake. While the amendment does not define "watercourse," the Ohio Supreme Court has long defined that term as "a stream usually flowing in a particular direction in a definite channel having a bed, banks, or sides and discharging into some other stream or body of water. It need not flow continuously, and may some times be dry or the volume of such water course may sometimes be augmented by freshets or water backed into it from a lake or bay or other extraordinary causes; but so long as it resumes its flow in a definite course in a recognized channel and between recognized banks, such stream constitutes a water course." *E. Bay Sporting Club v. Miller* (1928), 118 Ohio St. 360, 363, 161 N.E. 12. According to Joel Helms, because of the berms he constructed around the wetlands, water from them no longer passes into the adjacent creek tributary. The wetlands, therefore, could not be a watercourse because they do not discharge into a stream or other body of water.

{¶ 24} Even if the amendment recognizes the Helmses' property rights in the wetlands, including their right to make reasonable use of them, we conclude that it does not give the Helmses the right to pollute the wetlands with improperly treated sanitary sewage. The Helmses' third assignment of error is overruled.

## APPROVABLE APPLICATION

{¶ 25} The Helmses' fourth assignment of error is that the trial court's finding that their permit-to-install application was not approvable because it

sought to use the wetlands on their property for wastewater treatment was against the manifest weight of the evidence. According to the Helmses, the court's mistake led it to incorrectly conclude that they had violated the consent order. They have argued that the court's finding was incorrect because the existing wetlands do not form a junction with waters of the state, the wetlands were intentionally and properly developed in accordance with Ohio Environmental Protection Agency guidelines, the wetlands are an effective mechanism for treating wastewater, and their application contained all the information that was necessary for its approval.

{¶ 26} Regarding whether the wetlands combine or form a junction with waters of the state, the Helmses have repeated their arguments in support of their second assignment of error. They have also repeated their arguments regarding the constitutional amendment that was the basis of their third assignment of error. As explained earlier, those arguments are without merit.

{¶ 27} Regarding whether the wetlands were developed in accordance with agency guidelines, the Helmses' argument is not supported by the record. The attorney general presented evidence that the wetlands have been in existence since at least 1938. Even accepting Joel Helms's testimony that they formed after a farmer inadvertently cut the discharge pipe from the wastewater treatment plant, Helmses' argument that their creation was intentional or done in accordance with agency guidelines is not supported.

{¶ 28} The Helmses have argued that the Ohio Environmental Protection Agency has known since 1994 that they intended to use the wetlands on their property for wastewater-treatment purposes. They have pointed to a 1996 letter from the agency that suggests that if the Helmses constructed additional wetlands for treatment purposes, the existing wetlands could be considered part of the treatment system. The letter notes, however, that the existing wetlands could be considered part of the treatment system only if they met certain discharge and soil-permeability requirements. The attorney general presented evidence that the wetlands were too permeable to be used for wastewater treatment. While the Helmses presented evidence that the soil beneath the wetlands is not permeable, the trial court found their evidence not credible.

{¶ 29} Regarding whether the existing wetlands are an effective mechanism for treating wastewater, the Helmses have noted that Micacchion testified that wetlands act like "kidneys of the landscape because they do a really outstanding job of filtering pollutants out of the waters." Although Micacchion said that was generally true about wetlands, he also testified about the disruptive and degrading effect the sewage from Countryview was having on these particular wetlands. Furthermore, although the Helmses presented evidence that the quality of the

water in the wetlands improved the further away from where the sewage discharged, the court did not find his testimony credible.

{¶ 30} Regarding whether the Helmses' permit-to-install application was complete, Ohio Environmental Protection Agency employees testified that the application did not contain enough information to determine whether the wetlands the Helmses planned to construct would be able to effectively treat the amount of wastewater they planned to send through it. The application also did not include plans for a disinfection stage. According to the Ohio Environmental Protection Agency, it requested additional specifications from the Helmses and the professional engineer they had hired, but did not receive the information they needed to perform the required calculations.

{¶ 31} The trial court found that the Helmses did not provide sufficient information in their initial permit-to-install application and refused to provide the missing details when the Ohio Environmental Protection Agency requested them to do so. It, therefore, found that the Helmses could not have reasonably expected that their application would be approved. We have reviewed the record and conclude that its findings are supported by competent, credible evidence. The Helmses' fourth assignment of error is overruled.

## TESTING DATA

{¶ 32} The Helmses' fifth assignment of error is that in determining whether they violated Ohio's water-pollution laws, the trial court incorrectly relied on the Ohio Environmental Protection Agency's testing data because the samples it took are not representative of the treated effluent. The Helmses have argued that because the existing wetlands are not waters of the state and are being used as the third stage of their wastewater-treatment plant, it was improper for the Ohio Environmental Protection Agency to test the wastewater where it flowed into the wetland from the second stage of the treatment plant. According to the Helmses, the appropriate place to test the water is at the opposite end of the wetlands, after it has been treated by them.

{¶ 33} The Helmses' argument is based on their incorrect belief that the wetlands are not waters of the state. Their argument is also based on their mistaken impression that the wetlands are part of their treatment system. The Helmses have never had a permit to use the wetlands as a component of their wastewater-treatment plant. The original permit contemplated that the third stage would consist of a dosing pump and surface sand filters. The trial court properly concluded that it was correct for the Ohio Environmental Protection Agency to test the effluent from where it exited the final stage that was constructed under a permit. In this case, that was at the end of the second

stage, before the wastewater flowed into the wetland. The Helmses' fifth assignment of error is overruled.

## PUBLIC SEWER SYSTEM

{¶ 34} The Helmses' sixth assignment of error is that the trial court incorrectly ordered them to connect Countryview to the public sewer system. They have argued that the apartment building is exempt from mandatory connection under R.C. 6117.51 and that the court lacked authority to otherwise order the connection.

{¶ 35} Under the terms of the 1974 permit to install, the Countryview "treatment plant shall be abandoned and the sanitary system connected to the public sanitary sewer whenever such system becomes available." According to the Helmses, whether the public sewer system is "available" should be evaluated under R.C. 6117.51. They have noted that there is an exception under R.C. 6111.51(D) for "[a]ny premises that are served by a common sewage collection system when both the foundation wall of the structure from which the sewage or other waste originates and the common sewage collection system are more than two hundred feet from the nearest boundary of the right-of-way within which the public sewer is located." The Helmses have argued that the apartment building falls under the exception because its rear foundation wall is not within 200 feet of the public sewer right-of-way.

{¶ 36} Assuming for the sake of argument that the trial court was required to apply R.C. 6117.51 in determining whether the public sewer system was "available" under the 1974 permit, the Helmses' argument is still without merit. Although there was testimony that the rear wall of the apartment building is 430 feet from the public sewer line, an engineer from the Summit County Department of Environmental Services testified that the southwest corner of the building is 150 feet and the northwest corner is approximately 195 feet from the sewer right-of-way. The Helmses have not cited any authority for their argument that the entire building must be within 200 feet of the right-of-way. Rather, courts "are required to apply the plain language of a statute when it is clear and unambiguous." *Jaques v. Manton*, 125 Ohio St.3d 342, 2010-Ohio-1838, 928 N.E.2d 434, at ¶ 14. R.C. 6117.51(D) is unambiguous. "[T]he foundation wall of the structure" means any foundation wall of the structure. See *Fry v. Hildebrant* (1985), 26 Ohio App.3d 126, 128, 26 OBR 337, 498 N.E.2d 1089 (reaching the same conclusion when applying similar language under R.C. 6117.51(C)).

{¶ 37} The Helmses have also argued that they did not violate any water-pollution laws and that there is no basis for the trial court's finding that the wastewater-treatment plant is a nuisance. While the Helmses are certainly entitled to make this argument, it is an exercise in futility given the overwhelm-

ing evidence against them. There was evidence that the Helmses have discharged improperly treated wastewater into the waters of the state for close to 20 years. There was evidence that the treatment plant was improperly maintained, causing sewage to overflow onto the ground surrounding the tank. There was evidence that the plant was not secure, allowing children from the apartment building access to it and the overflowed sewage. There was evidence that Joel Helms had planned to "treat" some of the sewage by placing it in commercial washing machines, in an attempt to use centripetal force to eliminate pollutants from the water. There was evidence that the Helmses had taken sewage from the plant, dried it, and used it for landscaping purposes around the apartment building.

{¶ 38} The trial court correctly concluded that the Helmses were required to connect Countryview to the public sewer system under the terms of the 1974 permit to install. The Helmses' sixth assignment of error is overruled.

## PUBLIC WATER SYSTEM

{¶ 39} The Helmses' seventh assignment of error is that the trial court incorrectly determined that Countryview had a public water system for the years 2002 to 2006. They have argued that the evidence demonstrated that the apartment building actually had two private water systems during those years, each one supplying drinking water to half of the units.

{¶ 40} Under Ohio Adm.Code 3745–81–01(BBBB), "[p]ublic water system" means "a system which provides water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves an average of at least twenty-five individuals daily at least sixty days out of the year." Under Ohio Adm.Code 3701–28–01(ZZ), "[p]rivate water system" means "any water system, other than a public water supply system, for the provision of water for human consumption, if the system has fewer than fifteen service connections and does not regularly serve an average of at least twenty-five individuals daily at least sixty days each year." " 'Service connection' means that point at which the private water system enters any structure used for agricultural purposes, building, or dwelling." Ohio Admin.Code 3701–28–01(EEE). The Helmses have argued that because each well at Countryview served less than 25 people, they were incorrectly regulated as operating a public water system.

{¶ 41} According to Joel Helms, when his family reacquired the apartment building in the 1980s, each of the wells on their property served one half of the units. In the 1990s, however, they changed the system so that one well served the entire building. That way, they had to monitor water quality from only one well. According to John Helms, who does maintenance for Countryview, in 2002,

the Helmses went back to having each well serve only half the building so they could fall beneath the population levels for a public water system. He testified that the system did not become a public water system again until 2006, when the population level at the apartment building was so high that it did not matter whether there was a joint system or two separate systems. At that point, the Helmses resumed supplying drinking water from only one well to save on monitoring and treatment costs.

{¶ 42} Even assuming that the Helmses' argument that two wells, each serving half the building, would have been two private water systems instead of one public water system, John Helms's testimony that each of the wells served half the building between 2002 and 2006 was contradicted by the consumer-confidence reports the Helmses prepared for those years. Those reports indicate that the building "receives its primary drinking water from the underground well south of 5027. A secondary source of water is available from the well north of 5007." The 2003 report further indicates that the north well "has not been used since 2001." Accordingly, there is some competent, credible evidence to support the trial court's finding that Countryview was served by only one water system from 2002 to 2006 and that it met the criteria for a public water system. The Helmses' seventh assignment of error is overruled.

## DRINKING–WATER VIOLATIONS

{¶ 43} The Helmses' eighth assignment of error is that the trial court incorrectly determined that they stipulated to the drinking-water violations. They have argued that the only thing they stipulated to was that they had received notices of violations and the authenticity of those notices. According to the Helmses, the court improperly ruled on the violations in the absence of any evidence supporting them and denied them a meaningful opportunity to present a defense.

{¶ 44} Over the first two days of the August 2008 hearing, the state presented testimony from Ohio Environmental Protection Agency employees about the drinking-water violations at Countryview. In particular, it presented testimony about E. coli and total coliform violations in 2006, the Helmses' persistent failure to conduct required testing, their failure to display or update the building's contingency plan, and their failure to provide timely consumer-confidence reports. At the beginning of the third day of the hearing, the trial court said that it understood "that agreement has been reached on a substantial portion of the claims being made." The assistant attorney general explained that it was his "understanding * * * that the State would be suspending its portion of the case as it relates to the drinking water counts," that "the [Helmses] are willing to stipulate to all of the notices of violation," that "the defense is willing to enter into

an agreement to connect to the public drinking water supply system," and that "the issues of violation and civil penalty would be left for [the court] to go ahead and decide at this point or at a penalty hearing * * *." The Helmses' lawyer replied, "We agree that * * * the Court at a subsequent hearing will decide whether and, if so, how much any penalty would be, and * * * that you will have every notice of violation that we will stipulate was received, you will have the testing that we have already identified in our exhibits. And the only additional information, of course, would be anything in mitigation that [the Helmses] wanted to present."

{¶ 45} Near the end of the hearing, the court discussed what would happen following it. The court asked the parties how long they needed to prepare for "the penalty hearing on the drinking water side." When the assistant attorney general mentioned that he would need some time to put on "evidence regarding compliance with the * * * consent order," the Helmses' lawyer interrupted, saying: "I thought the penalty phase was only for the public water system * * *." The court responded: "That's right. I mean, * * * there is a penalty phase. We agree there is going to be a penalty phase on the drinking water matter that's otherwise resolved." The Helmses' lawyer did not object to the court's characterization of the drinking-water case. The court then told the parties that in addition to the penalty phase for the drinking-water violations, it was "also going to deal with the question of whether the consent decree has been violated." The Helmses' lawyer responded, "Correct."

{¶ 46} The Helmses have argued that the trial court incorrectly wrote in its journal entry resolving liability for the drinking-water violations that "[the Helmses] stipulated [to] factual matters pertaining to their liability for Drinking Water violations during the trial. The issue of civil penalties for the violations was reserved for further hearing." The Helmses, however, did, in fact, stipulate that they had received notices of violation, which was a question of fact pertaining to whether they were liable. The parties also specifically agreed that the amount of penalties for the alleged violations would be considered at a subsequent hearing. Accordingly, the Helmses have failed to identify anything inaccurate in what the trial court wrote.

{¶ 47} The Helmses have attempted to characterize the trial court's statement as a declaration that they stipulated to their liability for the drinking-water violations. Their argument is inconsistent with the trial court's journal entry. The court did not determine that the Helmses were liable based on their stipulation. Instead, it found that the Helmses had not tested "for various contaminants at times in the years 1999–2006. [The Helmses] also did not always retest as frequently as required when total coliform bacteria was found. [The Helmses] moreover failed to give required notices to the residents, both as to the

periodic condition of the water, the failure to test and when contamination occurred. * * *. Certain required monitoring, sampling, and other plans and reports have not been submitted to date, or not at the required frequency. The residents of CVSA were placed at substantial risk by [the Helmses'] conduct." It provided footnotes listing the litany of specific violations.

{¶ 48} The Helmses have also argued that the attorney general failed to present competent and credible evidence for the alleged violations. Regarding civil cases, the Ohio Supreme Court has written, "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court [if] 'the evidence is legally sufficient to support the [judgment] as a matter of law.'" *Bryan–Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198, at ¶ 3, quoting *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 49} In addition to the testimony that the attorney general presented during the first two days of the hearing, he submitted exhibits detailing each of the alleged drinking-water violations. Among those exhibits were 19 lab reports showing positive test results for total coliform. Because many of the alleged violations were for failure to test or failure to issue public notices, there is no physical evidence of a violation. John Henn, an environmental specialist for the Ohio Environmental Protection Agency, however, testified about the Helmses' failure to conduct required testing and their failure to update or display their contingency plan. We have reviewed the record and conclude that there is some competent, credible evidence to support the trial court's decision regarding the drinking-water violations.

{¶ 50} The Helmses have further argued that the trial court denied them the ability to present evidence in defense of the drinking-water claims at the August 2008 hearing. The Helmses, however, did not attempt to call anyone to testify about the drinking-water violations at the hearing. In addition, while Joel Helms testified at the hearing, his lawyer did not attempt to ask him any questions about the alleged drinking-water violations. We therefore conclude that the Helmses have forfeited their argument. See *Bank One N.A. v. Swartz*, 9th Dist. No. 03CA008308, 2004-Ohio-1986, 2004 WL 840118, at ¶ 17 ("It is a well established rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called, but did not call, to the attention of the trial court at the time when such error could have been avoided or corrected by the trial court"). The Helmses' eighth assignment of error is overruled.

### DRINKING–WATER PENALTIES

{¶ 51} The Helmses' ninth assignment of error is that the penalty the trial court imposed for the drinking-water violations was excessive and did not take

into account mitigating factors. They have argued that one of the reasons the award was too high was because the court incorrectly concluded that they had 25,786 days of violation. They have also argued that the court did not correctly apply the law in determining the appropriate penalty.

{¶ 52} The Helmses' first argument is directed, again, at whether the trial court's liability finding was supported by sufficient evidence. According to the Helmses, the attorney general did not present evidence that they violated Ohio Adm.Code 3745–81–14(D) and (F) and 3745–81–21(B)(1) in October 2003, April 2004, September 2004, June 2006, or July 2006.

{¶ 53} In addition to the evidence submitted by the attorney general, the Helmses' own evidence supports the trial court's findings. The Helmses submitted laboratory reports indicating positive total coliform test results for April 2004, September 2004, June 2006, and July 2006. Joel Helms also testified that there was a positive test result in October 2003. Even in their brief, the Helmses have recognized that the evidence they submitted demonstrates that the water system tested positive for total coliform during those months.

{¶ 54} The Helmses have argued that they are not liable for some of the positive test results because follow-up tests came back negative. They have not cited any authority in support of their argument. Furthermore, under Ohio Adm.Code 3745–81–21(B), "[w]hen a routine sample is determined to be total coliform-positive, the public water system shall monitor with a set of four repeat samples within twenty-four hours of being notified of the positive result." There is no evidence in the record that the Helmses took the required number of repeat samples within 24 hours of the positive total coliform results.

{¶ 55} The Helmses have argued that they are not liable for the June and July 2006 positive test results because they admitted there was a problem during those months, provided substitute drinking water for their tenants, and worked diligently to solve the problem. Again, they have not cited any authority suggesting that diligence is an excuse for noncompliance. Accordingly, we conclude that the trial court's finding that the Helmses violated Ohio Adm.Code 3745–81–14(D) and (F) and 3745–81–21(B)(1) in October 2003, April 2004, September 2004, June 2006, and July 2006 is supported by the record.

{¶ 56} The Helmses have next argued that the trial court incorrectly determined that they violated Ohio Adm.Code 3745–81–14(B) on June 1, 2000, because even though they had a positive test result the day before, they followed up with five required tests. Section 3745–81–14(B), however, concerns multiple routine positive total coliform samples in a month. It has nothing to do with repeat-testing requirements.

{¶ 57} The Helmses have next argued that there was no evidence that they violated testing requirements in November 1999. The alleged violation was for failure to collect the minimum number of samples for the month. The Helmses have not pointed to any evidence demonstrating that they collected any samples in November 1999. One of the Helmses testified at the penalty hearing that he could not find any reports or bills from a testing company for that month. The trial court, therefore, could have reasonably inferred that the Helmses had not done any testing that month.

{¶ 58} The Helmses have next argued that the court incorrectly found that they failed to do a monthly test in February 2000 or March 2001. The documents they have pointed to in support of their argument, however, show that those samples were collected in January 2000 and April 2001, not February 2000 or March 2001.

{¶ 59} The Helmses have next argued that the court incorrectly found that they failed to take the correct number of routine samples during the months after they had positive test results. Although the Helmses' exhibits demonstrate that they conducted some follow-up tests, the exhibits do not establish that the Helmses conducted five routine tests during the months after they had positive test results. See Ohio Adm.Code 3745–81–21(B)(7) ("When a public water system * * * has one or more total coliform-positive samples, [it] shall monitor with at least five routine samples during the next month").

{¶ 60} The Helmses have next argued that the court incorrectly found that they did not conduct lead and copper testing, pointing to the consumer-confidence reports they prepared for 1998 and 1999. Even if the reports establish that the Helmses conducted some copper and lead testing during those years, Henn testified that the Helmses were required to test multiple times each year. See Ohio Adm.Code 3745–81–86(D)(1)(b) (small systems must test for lead and copper every six months). The consumer-confidence reports do not establish the frequency of the Helmses' tests for lead and copper.

{¶ 61} The Helmses have further argued that they did not take samples for certain contaminants because they thought they were not required to test for them. They have not cited any authority for their argument that ignorance of the testing requirements excuses their failure to test. Joel Helms also testified that they hired a certified operator for the public-water system, who presumably would have known about the testing requirements. Joel Helms further testified that he, himself, had passed the test to become a certified operator, but explained that he could not become one because he had contributed to a "governmental organization that has by force tried to change the policy of another government." According to Helms, that organization is the Internal Revenue Service, which finances the State Department, which "by force changes the policies of other countries." Helms's political beliefs aside, the fact that he passed the examina-

tion to become a certified operator of a public-water system undermines his credibility regarding whether he had knowledge of the testing requirements. Accordingly, we again conclude that the trial court's findings regarding the Helmses' drinking-water violations are supported by sufficient evidence and are not against the manifest weight of the evidence.

{¶ 62} The Helmses' next argument is that the trial court exercised improper discretion when it determined the amount of their penalty for their drinking-water violations. Under R.C. 6109.33, "[a]ny person who violates [this Chapter or any rule adopted under it] shall pay a civil penalty of not more than twenty-five thousand dollars for each violation * * *."

{¶ 63} To determine the appropriate penalty, the trial court considered the criteria employed in *State ex rel. Brown v. Dayton Malleable, Inc.* (Apr. 21, 1981), 2d Dist. No. 6722, 1981 WL 2776, *3–4, reversed on other grounds (1982), 1 Ohio St.3d 151, 1 OBR 185, 438 N.E.2d 120. In that case, the trial court used a methodology that had been adopted by the United States Environmental Protection Agency, consisting of three steps. The first step was to "[d]etermine and add together the appropriate sums for each of the four factors or elements of this policy namely: the sum appropriate to redress the harm or risk of harm to public health or the environment, the sum appropriate to remove the economic benefit gained or to be gained from delayed compliance, the sum appropriate as a penalty for violator's degree of recalcitrance, defiance, or indifference to requirements of the law, and the sum appropriate to recover unusual or extraordinary enforcement costs thrust upon the public." *Dayton Malleable* at *3. The second step was to "[d]etermine and add together sums appropriate for mitigating factors, of which the most typical are the following: the sum, if any, to reflect any part of the non-compliance attributable to the government itself, [and] the sum appropriate to reflect any part of the non-compliance caused by factors completely beyond violator's control (floods, fires, etc.)." Id. at *4. The final step was to "[s]ubtract the total reductions of Step 2 from the total penalty of Step 1. The result is the minimum civil penalty * * *." Id.

{¶ 64} The Helmses have argued that although the *Dayton Malleable* test is an appropriate test, the trial court incorrectly applied it. In deciding the amount of the penalty, the trial court found the same factors present as when it calculated the Helmses' penalty for their water-pollution violations. In its prior decision, the court had found the following: "1) The harm * * * was significant; 2) [the Helmses] gained substantial economic benefit from their delay in compliance; 3) [the Helmses'] recalcitrance, defiance, and indifference to requirements of the law have been extreme; and 4) unusual and extraordinary enforcement costs have been thrust upon the public. There are no mitigating factors. [The Helmses'] non-compliance was entirely the product of their own decisions. [They] presented no evidence that they would be unable to pay such a penalty." The court

further noted that "all of the 'aggravating' *Dayton Malleable* factors suggest a high range of penalty and there are no applicable 'mitigating' factors. The [Helmses'] conduct until very recently has been in willful disregard of the law, resulting in serious risk to the health of their tenants and great expense to the public for enforcement."

{¶ 65} The trial court's evaluation of the *Dayton Malleable* factors is supported by the record. We note that the trial court imposed the lowest of the attorney general's proposed penalties, choosing to fine the Helmses only $25,000 for each violation, regardless of duration. It also allowed the Helmses to abate 90 percent of the penalty by remaining connected to a public drinking-water system. The Helmses' ninth assignment of error is overruled.

## CONCLUSION

{¶ 66} The trial court had jurisdiction over the 2007 water-pollution case, it correctly concluded that the wetlands are waters of the state, it correctly denied the Helmses' motion for new trial, it correctly determined that the existing wetlands could not be used for wastewater-treatment purposes, it correctly relied on the state's testing data, it correctly concluded that Countryview's water system was a public-water system, it correctly determined that the Helmses violated Ohio's safe-drinking-water laws, and it exercised proper discretion when it imposed a penalty for the drinking-water violations. The judgment of the Summit County Common Pleas Court is affirmed.

Judgment affirmed.

CARR and WHITMORE, JJ., concur.